UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| OFFSHORE MARINE CONTRACTORS, INC. | CIVIL ACTION NO. |
| VERSUS | SECTION " " |
| PALM ENERGY OFFSHORE, L.L.C. AND CHET MORRISON WELL SERVICES, L.L.C. | MAGISTRATE " " |

_____

## COMPLAINT

The Complaint of Offshore Marine Contractors, Inc. ("Offshore Marine"), a Louisiana corporation with its principal place of business in the State of Louisiana, specifically the Parish of Lafourche, with respect represents as follows:

1.

This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This Court has jurisdiction under 28 U.S.C. 1333.

2.

Jurisdiction is based on the general maritime law.

3.

Venue is proper in the Eastern District of Louisiana because plaintiff, Offshore Marine, resides in this district and maintains its principal place of business in Louisiana within the jurisdiction of this court, specifically in Lafourche Parish. Defendant, Chet Morrison Well Services, L.L.C. ("Chet Morrison") is a domestic (Louisiana) limited liability company residing in this judicial district (Terrebonne Parish), is amenable to service in this district, and the place of contracting of the time charter which is directly an issue in this litigation was within this judicial district. Defendant Palm Energy Offshore, L.L.C. is a resident of Jefferson Parish, Louisiana whose principal business occurs in the State of Louisiana in the territorial waters of the State of Louisiana.

4.

The plaintiff herein is:

a) **OFFSHORE MARINE CONTRACTORS, INC**. ("Offshore Marine"), a Louisiana corporation with its principal place of business in the Parish of Lafourche, State of Louisiana.

5.

The defendants herein are:

a) **CHET MORRISON WELL SERVICES, L.L.C.** ("Chet Morrison"), a domestic limited liability company doing business in this judicial district (Terrebonne Parish) and state, who at all material times, maintained and currently maintains its principal office and its principal place of business in the State of Louisiana at 9 Dularge Road, Houma, Louisiana, 70363; and

b) **PALM ENERGY OFFSHORE, L.L.C.** ("Palm Energy"), a domestic limited liability company doing business in this judicial district (Jefferson Parish) and state, who at all material times, maintained and currently maintains its principal office and its principal place of business in the State of Louisiana at 3850 N. Causeway Boulevard, Suite 1770, Metairie, Louisiana, 70002.

## GENERAL ALLEGATIONS
*(The Parties and Their Relationship to Offshore Marine)*

6.

Offshore Marine is a Louisiana company based out of Cut Off, Louisiana who, among other things, owns and operates a fleet of self-elevating lift boats in the Gulf of Mexico.

7.

Defendant herein, Chet Morrison Well Services, L.L.C., is Louisiana limited liability company who from time to time charters vessels to further its business operations in the Gulf of Mexico. Chet Morrison has, from time to time, chartered vessels from plaintiff, Offshore Marine.

8.

Offshore Marine does not have a Master Service Agreement or Master Time Charter agreement with Chet Morrison. All vessel services to Chet Morrison, specifically the entity made defendant herein, are rendered on open account pursuant to verbal contract.

9.

Defendant herein, Palm Energy, is a Louisiana corporation that owns and operates certain oil and gas properties in Louisiana state waters. Upon information and belief, prior to July of 2009, Palm Energy Offshore both owned and operated (or had P&A obligations relating to) wells or property located at Chandeleur 37 (specifically wells A & B) and West Delta 54.

10.

While plaintiff, Offshore Marine, has a contractual agreement denominated as a "Master Service Agreement" between it and defendant, Palm Energy Offshore, L.L.C., in

response to demand made under Louisiana's open account statute Palm Energy has asserted that it did not charter the vessel described herein. As such, the terms and conditions of the Master Service Agreement between Offshore Marine and Palm Energy do not apply to the claims asserted herein.

11.

Rather, Palm Energy has asserted that while the vessel may have been chartered on it's behalf, the chartering party was defendant herein, Chet Morrison, and thus while Palm Energy may ultimately be liable to Chet Morrison, Palm Energy has no direct liability to Offshore Marine.

12.

Conversely, Chet Morrison has stated that while its employees were on board the vessels and while the request for charter came through employees for Chet Morrison, the responsible party is Palm Energy and therefore Chet Morrison has no direct liability to Offshore Marine.

13.

Invoices for the charter that is described herein have been sent both to Palm Energy and to Chet Morrison with each referring Offshore Marine to the other for payment.

**GENERAL ALLEGATIONS CONTINUED**
*(Palm Energy Partners' Bankruptcy in the Southern District of Texas
and the listing of Offshore Marine as a creditor therein)*

14.

On July 6, 2009, Offshore Marine sent a demand letter for payment on open account to Mr.

Jonathan Garrett at Palm Energy. The letter was sent by counsel pursuant to La. R.S. 9:2781 and demanded payment in full for the monies owed on open account as set forth herein.

15.

On July 16, 2009 Palm Energy, through counsel, again responded that Palm Energy did not engage Offshore Marine under its MSA. Rather, Palm disclaims responsibility for the charter based on the assertion that it contracted with defendant herein, Chet Morrison, who engaged Offshore Marine on its behalf.

16.

In Palm's response to Offshore Marine's open account demand, Palm directs that "*[t]he invoices tendered in your July 6, 2010 should be forwarded to [Chet] Morrison for its handling.*" (*See* Exhibit "A" attached hereto and incorporated herein by reference).

17.

On September 1, 2009, a separate but related company, Palm Energy Partners, L.L.C. filed for voluntary protection pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. Jonathan Garrett, the recipient of Offshore Marine's demand on July 6, 2009, is a principal in the debtor entity Palm Energy Partners, L.L.C.

18.

Upon information and belief around the same time another entity controlled in whole or in part by Jonathan Garrett filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas, Pisces Energy, L.L.C. According to documents filed in the bankruptcy court in Houston, Pisces took over operations of the Palm Energy Offshore

properties on which Offshore Marine's vessel L/B Nicole Eymard was working.

19.

Curiously, despite the fact that Offshore Marine has never worked for Palm Energy Partners or Pisces Energy, Offshore Marine was listed as a creditor of both entities in the bankruptcy proceeding.

20.

Out of an abundance of caution and respect for the jurisdiction of the United States Bankruptcy Court for the Southern District of Texas, Offshore Marine filed a proof of claim in bankruptcy in December of 2009. The proof of claim was filed in the amount of Two Million One Hundred Thirty One Thousand Eight Hundred and Sixty Six and 99/100 United States Dollars ($ 2,131,866.99 USD) representing both the open account claim referenced above as well as the value of the breach of contract claim set forth herein.

21.

On the 12TH day of February, 2010, in an affidavit filed into the record for the United States Bankruptcy Court for the Southern District of Texas, Jonathan Garrett attested to the fact that (1) Offshore Marine has never worked for Palm Energy Partners or Pisces, (2) that the work performed by Offshore Marine's vessel L/B Nicole Eymard was while she was under charter for either Palm Energy Offshore (a non-debtor) and/or Chet Morrison as a client of Palm Energy, and further that defendant herein, Palm Energy Offshore, L.L.C. would be the only company to contract for work performed on West Delta 54.

22.

In light of the subsequent withdrawal of the proofs of claim in reliance on Mr. Garrett's

representations under oath (*See* Exhibit "B" attached hereto), this matter is now ripe for adjudication by this honorable court.

## SPECIFIC ALLEGATIONS
*(The Charter of the L/B Nicole Eymard at Chandeleur 37 and West Delta 54)*

23.

On or about July 15, 2008 the vessel L/B Nicole Eymard (the "vessel Nicole") was working in the Gulf of Mexico on charter with Chet Morrison who was working at the time for defendant herein, Palm Energy.

24.

The specific terms of the charter providing for the day rate and other charges are set forth in the Job Order attached hereto as Exhibit "C" which is incorporated herein by reference.

25.

According to the Daily Master's Log, at 0130 hours on July 18, 2008, the vessel Nicole departed Venice, Louisiana en route to Chandeleur 37, specifically Well A. The vessel Nicole's customer was listed as "Chet Morrison / Palm" and the personnel manifest indicates that the personnel on board were from Chet Morrison Well Services and a third party contractor, Fugro Chance.

26.

In accordance with instructions received from charterer, the vessel Nicole jacked up at Chandeleur 37A and remained jacked on location at Chandeleur 37A until 0800 hours on July 24, 2008. According to the daily logs, the work was "as *directed by client*" and there were no incidents reported while on location. During this time frame the vessel logs were signed by

"Randy LaFleur" who, upon information and belief, was on board the vessel Nicole as a representative of Chet Morrison.

27.

At 0800 hours on July 24, 2008, the vessel Nicole commenced jacking down. At 0830 at the charterer's direction, the vessel Nicole relocated to Chandeleur 37 B where the logs reflect she was "jacked up on location" at 2200 hours and as working "*as directed p&a.*" Upon information and belief, the "p&a" work was being done by Chet Morrison as a client for Palm Energy Offshore.

28.

The vessel Nicole was on location jacked at Chandeleur 37B until July 27, 2008. During this time frame, Chet Morrison employees were the only personnel on board.

29.

On or about July 27, 2008 representatives of Chet Morrison contacted Offshore Marine and asked whether the vessel Nicole would be available for a short job at West Delta 54. This job was for Palm Energy but the request came through Chet Morrison. Representatives of Chet Morrison indicated that as the ultimate customer was Palm Energy, and as Chandeleur 37B and West Delta 54 were both Palm Energy properties, representatives of Chet Morrison had no problem with moving the vessel Nicole to West Delta 54 at Palm's request.

30.

The logs from the vessel Nicole indicate that from 0600 to 1500 hours on July 27, 2008 the vessel Nicole was breaking bottom whereupon at 1500 hours the vessel was en route to West Delta 54. The Daily Master's Log for July 27, 2008 reflects that it was signed by Randy

LaFleur, upon information and belief an employee of defendant, Chet Morrison.

31.

At 1330 hours on July 28, 2008 the vessel Nicole arrived at West Delta 54 and moved in to do the bottom survey. Preloading was commenced at 1400 hours and the vessel jacked without incident. There was no crew or personnel change between Chandeleur 37 and West Delta 54.

32.

At 1400 hours or thereabouts the vessel Nicole began to jack down and attempted to break bottom. She was unable to do so. Both the port and starboard front legs of the vessel Nicole were stuck and would not come free preventing the vessel from fully jacking down and coming off location. From that point until August 16, 2008 the vessel Nicole remained on charter at West Delta 54 but unable to move off location because of the fact that she could not fully jack down. During this time several options were explored with the advice and consent of both Chet Morrison and Palm Energy. By way of example, both Palm Energy (through Jonathan Garrett) and Chet Morrison (through John Dale Powers) approved the use of divers to try to jet the legs to free the vessel. Nothing worked and as of August 16, 2008 the vessel remained on location, on charter, and effectively immobilized.

33.

The contractual agreed to day rate on the vessel Nicole was $ 19,000.00 per day. Since the vessel remained on charter while stuck on location, charges began to mount for the defendants. It was at this point, after invoicing began, that representatives of Chet Morrison advised Offshore Marine to invoice Palm Energy directly.

34.

On or about August 15, 2008 Jonathan Garrett of Palm and John Dale Williams, president of Chet Morrison Well Services, defendant herein, contacted representatives of Offshore Marine with a work around solution to get the vessel Nicole off charter. Both Chet Morrison and Palm Energy had an interest in getting the vessel off charter as the costs were mounting with the vessel stuck on site. Moreover, Hurricane Fay was threatening interests in the Gulf of Mexico and the L/B Nicole Eymard was potentially threatened.

35.

The workaround proposed by John Dale Powers of Chet Morrison and Jonathan Garrett Palm Energy was for Offshore Marine to allow the legs on the vessel Nicole to be cut so that the vessel could be moved off location from West Delta 54. In exchange for Offshore Marine allowing the legs to be cut and thereby insuring that no further damage (this time from Hurricane Fay) would be sustained, Palm Energy and Chet Morrison agreed to pay for repairs to the legs and further to agree that the vessel would remain "on charter" until she was ready again to put to sea.

36.

Additional reassurances were given by Jonathan Garrett that Palm Energy's obligation would be honored in light of the fact that the claim concerning the cut would likely be covered by insurance as the debris which caused the legs to become stuck initially was present, according to Palm Energy, as a result of hurricane Katrina. Upon information and belief, an insurance claim was filed by Palm Energy but the status of said claim is unknown.

37.

The agreement reached by and between Offshore Marine, Palm Energy and Chet Morrison to cut the legs on the Nicole Eymard was an agreement separate and distinct from the agreement to Time Charter the vessel L/B Nicole Eymard.

38.

Neither Chet Morrison nor Palm Energy has paid Offshore Marine any of the monies owed relative to the charter of the L/B Nicole Eymard.

39.

Neither Chet Morrison nor Palm Energy has paid Offshore Marine pursuant to the subsequent agreement reached for repairs to the legs and other equipment on the L/B Nicole Eymard or has paid any other monies owed pursuant to this agreement. This has been despite amicable demand.

40.

Palm Energy takes the position that Chet Morrison owes the money to Offshore Marine.

41.

Chet Morrison has taken the position that Palm Energy owes the money to Offshore Marine.

42.

Neither has paid.

## SPECIFIC ALLEGATIONS
## COUNT 1
### (Failure to Pay Monies Owed under Time Charter/Open Account)

43.

Plaintiff, Offshore Marine, reasserts and re-alleges the allegations contained in paragraphs 1-42, inclusive, as if pleaded herein *in extenso.*

44.

As alleged above, on July 15, 2008, defendant Chet Morrison chartered the vessel L/B Nicole for either its own account or for the account of and with authority of Palm Energy.

45.

Offshore Marine specifically avers that the work performed by the vessel Nicole at Chandeleur 37 A & B was performed as requested in good faith and in an appropriate manner. There were no incidents while the vessel was on charter at that location. As respect this portion of the charter, Offshore Marine and has complied with the charter party in all respects. Moreover, Offshore Marine specifically avers that the vessel L/B Nicole Eymard was at all times fit for her intended purpose, seaworthy in all respects, properly manned, and did discharge all her duties under the charter without fail.

46.

Offshore Marine specifically avers further that the work performed by the vessel Nicole at West Delta 54 (sometime designated incorrectly as West Delta 55) was performed as requested in good faith and in an appropriate manner. The failure of the vessel to break ground was not a result of any breach of contract by Offshore Marine nor was the failure to break ground the result of any inherent vice or defect in the vessel Nicole. Offshore Marine was not

responsible for the bottom survey and jacked on location specifically where instructed to jack.

47.

As respect this portion of the charter, Offshore Marine and has complied with the charter party in all respects. Moreover, Offshore Marine specifically avers that the vessel L/B Nicole Eymard was at all times fit for her intended purpose, seaworthy in all respects, properly manned, and did discharge all her duties under the charter without fail.

48.

Offshore Marine specifically avers that the invoices relative to the time charter in question were directed to the appropriate company representatives. Initially, the invoices were directed to the billing department at Chet Morrison as per the routine practice of Offshore Marine. As Offshore Marine had chartered vessels to Chet Morrison Well Services before, and as future charters were contemplated, Offshore Marine complied with the terms of the charter and the routine practice between the companies.

49.

Chet Morrison refused to pay for the charter of the vessel Nicole referenced herein.

50.

Chet Morrison specifically instructed Offshore Marine to invoice Palm Energy directly as the charter was allegedly on behalf of Palm Energy. Thereafter, at Chet Morrison's request, Offshore Marine billed Palm Energy in accordance with the terms and conditions of the MSA in effect between Offshore Marine and Palm Energy. Through counsel, Palm Energy responded that the MSA did not apply and the charter obligation was Chet Morrison's to honor.

51.

Offshore Marine specifically avers that it is entitled to be compensated in accordance with the charter party's terms and provisions. Plaintiff is entitled to recover all amounts due to it, as well as actual, and where applicable consequential (bad faith), damages, interest thereon, attorneys fees and costs of collection and other costs as may be taxable for the willful breach of this contract by defendants, and each of them. Offshore Marine further shows that the services rendered by Offshore Marine are in the nature of maritime services, specifically the chartering of a vessel pursuant to Time Charter.

**SPECIFIC ALLEGATIONS**
**COUNT 2: BREACH OF CONTRACT**

52.

Plaintiff, Offshore Marine, reasserts and re-alleges the allegations contained in paragraphs 1-42, inclusive, as if pleaded herein *in extenso.*

53.

On or about August 15, 2008 Offshore Marine and defendants entered into a contract whereby in consideration for taking the vessel off charter at West Delta 54 and allowing her legs to be cut, defendants would pay to restore the vessel fully to her pre-charter condition and moreover to compensate Offshore Marine for all downtime.

54.

At all times material Offshore Marine, Inc. has satisfied all of its obligations under the Agreement in existence between it and defendants. Offshore Marine allowed the legs to be cut at defendants request, paid to have the vessel repaired and restored and submitted invoices to

defendants relative thereto.

55.

Defendants have breached the agreement by failing to perform under the agreement / contract in good faith and in that defendants have failed to pay for the repairs and restoration of the vessel as agreed to and have failed to reimburse Offshore Marine for the damages sustained subsequent to the agreement to cut the legs.

56.

Defendants have at all times material acted in bad faith and Offshore Marine is entitled to damages relative thereto.

57.

The principal inducement, consideration or "cause" for Offshore Marine to enter into the agreement which in part forms the basis of Count 2 of this suit, was the representation by defendants acting through Jonathan Garrett and John Dale Williams that the vessel would be restored and Offshore Marine would be made whole.

58.

As a direct and proximate result of the breach of the agreement by defendants Offshore Marine has sustained damages that are compensable including but not limited to damages for breach of contract, consequential and bad faith damages.

59.

Offshore Marine specifically avers that it is entitled to be compensated in accordance with the contractual terms and provisions both of the tine charter and the contract for repair and restoration. Plaintiff, Offshore Marine, is entitled to recover all amounts due to it, as well as

actual, and where applicable consequential, damages, interest thereon, attorneys fees and costs of collection and other costs as may be taxable for the willful breach of the contracts referenced herein including the time charter for hire of the vessel Nicole as well as the contract by and between defendants for repair of the vessel.

**WHEREFORE**, plaintiff, Offshore Marine, prays for judgment in its favor against the defendants, Chet Morrison Well Services, L.L.C. and Palm Energy Offshore, L.L.C. awarding plaintiff all sums due, together with costs, legal interest, attorneys fees and all other equitable relief as this honorable court deems just and proper.

Respectfully submitted:
**OFFSHORE MARINE CONTRACTORS, INC.**

s/ Martin S. Bohman
MARTIN S. BOHMAN  (T.A.)
Louisiana Bar # 22005
133 W. 113TH Street
Cut Off, Louisiana 70345
Telephone (985) 632-7927
Facsimile  (985) 632-3704

*And*

**CARLETON DUNLAP OLINDE MOORE & BOHMAN, L.L.C.**

s/Victor R. Loraso, III
VICTOR R. LORASO, III
Louisiana Bar # 31239
One American Place, Suite 900
Baton Rouge, Louisiana
Telephone (225) 282-0600
Facsimile  (225) 282-0650

*ATTORNEYS FOR OFFSHORE MARINE*