UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

OFFSHORE MARINE CONTRACTORS,                CIVIL ACTION
INC.

VERSUS                                      NO: 10-4151

PALM ENERGY OFFSHORE, LLC AND               SECTION: R(3)
CHET MORRISON WELL SERVICES,
LLC

ORDER AND REASONS

I.    INTRODUCTION

This dispute arises out of outstanding charter fees for and damages sustained by a vessel when it became lodged in the seabed while plugging a well in the Gulf of Mexico. Plaintiff Offshore Marine Contractors, Inc. (OMC) owns a fleet of lift boats used in oil well operations. On October 29, 2010, OMC sued defendants Palm Energy Offshore, LLC (PEO) and Chet Morrison Well Services, LLC (CMWS), for failure to pay for the charter of one of OMC's vessels, the L/B Nicole Eymard.[1] OMC also sued the defendants for breach of a separate oral agreement that defendants allegedly formed with plaintiff after one of the legs of the vessel became stuck.[2] Under the terms of this alleged agreement, defendants promised to pay plaintiff for repair costs and lost charter fees

_____

    [1]    R. Doc. 1.

    [2]    Id.

if plaintiff cut the legs of the vessel to free it.[3]

CMWS filed a counterclaim against OMC alleging that the crew of the L/B Nicole Eymard failed to exercise proper care in manning the vessel during the period in question, and further alleging that OMC owed indemnity to CMWS for any liability by virtue of an agreement between OMC and PEO.[4] PEO filed a crossclaim against CMWS asserting that CMWS was responsible for the charter fees and that CMWS was required to indemnify PEO against OMC's claims pursuant to an agreement between CMWS and PEO.[5] CMWS in turn filed a counterclaim against PEO asserting that PEO was responsible for the charter fees and was required to indemnify CMWS under the agreement between the two companies.[6] Finally, CMWS filed a third-party complaint against H.C. Resources, LLC ("HCR"), contending that any losses suffered by OMC were the result of HCR's negligence and breach of contract.[7] HCR moved for summary judgment on CMWS's claims against it, and the Court granted the motion and dismissed HCR from this suit on December 11, 2012.[8]

---

[3]     *Id.*

[4]     R. Doc. 10.

[5]     R. Doc. 26.

[6]     R. Doc. 27.

[7]     R. Doc. 30.

[8]     R. Doc. 113.

CMWS also filed a separate suit against HCR and PEO on December 12, 2012, alleging that if CMWS were found to have chartered the L/B Nicole Eymard, HCR and PEO were obligated to pay Chet Morrison the cost of the charter, plus a 15% markup and interest for untimely payments. The complaint further alleged that the failure of HCR and PEO to pay the charter fees constituted a breach of contract. That case, captioned *Chet Morrison Contractors, LLC v. Palm Energy Offshore, LLC and H.C. Resources, LLC*, No. 2:12-cv-02973, was consolidated with this suit per the Court's February 6, 2013 order.[9]

On June 24-25, 2013, the Court conducted a bench trial on the claims of the parties. The Court has original jurisdiction over the claims pursuant to 28 U.S.C. § 1333, as the actions arise from maritime contracts. *See* 28 U.S.C. § 1333 ("The district courts shall have original jurisdiction, exclusive of the courts of the States, of [a]ny civil case of admiralty or maritime jurisdiction . . . ."). After hearing live testimony and reviewing all the evidence, the Court rules as follows.

## II.  BACKGROUND

OMC is a Louisiana company that owns and operates a fleet of self-elevating liftboats in the Gulf of Mexico.[10] The facts

---

[9]     *See* R. Doc. 140.

[10]    *See, e.g.*, Testimony of Raimy Eymard.

3

giving rise to this suit concern two jobs undertaken by one of OMC's liftboats, the L/B Nicole Eymard, during the summer of 2008. The first was a plugging and abandonment (P&A) operation at the Chandeleur 37 wells, which are owned by defendant HCR.[11] The second was a response to a well control event at the West Delta 55 wells,[12] which are owned by defendant PEO.[13] After performing the West Delta 55 job, the Nicole Eymard was unable to move off location because one of its legs had become stuck. Divers cut the leg in order to free the vessel, and it then returned to port to undergo repairs. The parties dispute who is responsible for (1) the charter hire for the two jobs, (2) the charter fees incurred while the vessel was being repaired ("downtime charter"), and (3) the cost of the repairs.

## III. THE CHANDELEUR 37 JOB

### A. Chronology of Events

William Gray, 50% owner of Palm Energy Partners, LLC (which in turn owns defendant PEO),[14] was the court-appointed manager of the wells owned by HCR during the period in question, including

---

[11]    Uncontested Material Fact #1.

[12]    This area is occasionally misidentified in the parties' submissions as West Delta 54.

[13]    Uncontested Material Fact #3.

[14]    Uncontested Material Fact #6.

4

those at the Chandeleur 37 block.[15] Gray asked his partner
Jonathan Garrett, the other co-owner of Palm Energy Partners, to
assist HCR with a P&A operation at the Chandeleur 37 wells.[16] In
early July 2008, Garrett informed John Dale Williams, the
president of defendant CMWS,[17] that work was needed at the
Chandeleur 37 wells.[18]

Williams in turn requested a quote for charter of a lift
boat from Avis Bourg III, OMC's vice-president of sales and
marketing, who had previously contacted Williams in an effort to
solicit business for OMC.[19] Bourg III gave a price of $19,000 per
day for the L/B Nicole Eymard,[20] and Williams agreed to charter
the vessel.[21] Williams confirmed the truth of this account in his
deposition: he explicitly stated that after Bourg III gave him a
price, Williams, acting on behalf of CMWS, decided to hire OMC
for the Chandeleur 37 job.[22]

---

[15]    Uncontested Material Fact #8.

[16]    Testimony of Jonathan Garrett; William Gray.

[17]    Testimony of John Dale Williams.

[18]    Testimony of Jonathan Garrett.

[19]    Testimony of Avis Bourg III; John Dale Williams.

[20]    OMC Exhibit 1; Testimony of Avis Bourg III.

[21]    Testimony of John Dale Williams.

[22]    *Id.* At trial, Williams recanted this portion of his
deposition testimony. The Court does not find Williams' trial
testimony credible to the extent that it conflicts with his

Following the conversation with Williams, Bourg III executed a work order for the Chandeleur 37 job.[23] The work order, dated July 15, 2008, identified the customer as "Chet Morrison/Well Division/Palm" and the customer representative as "John Dale Williams." The dayrate for the vessel was listed as $19,000, and the duration and offload dock were both designated "TBA."[24] An OMC employee apparently forwarded the work order to Williams.[25] Williams in turn forwarded it to Garrett on the morning of July 15 in an e-mail with the subject line "FW: OMC Job Report – Chet Morrison."[26] The e-mail reads, "Jon, I will have them bill you direct to avoid any markup. Please send me the billing information for HR and address the way you want it to appear."[27] Garrett immediately responded with HCR's address.[28] Garrett testified that his original intent was for HCR to pay CMWS for the liftboat, but that Williams offered to have OMC bill HCR directly in order to avoid CMWS's 15% markup.[29] Garrett explained

---

deposition testimony and other evidence in the record.

[23]    *See* OMC Exhibit 1.

[24]    *Id.*

[25]    PEO Exhibit 3.

[26]    *Id.*

[27]    *Id.*

[28]    *Id.*

[29]    Testimony of Jonathan Garrett.

that the cost savings associated with this arrangement made it attractive to HCR, which was in bankruptcy. He also stated, however, that the direct billing conversation did not change the party chartering the vessel -- in other words, OMC was still working for Chet Morrison, *not* for HCR.[30] Garrett never discussed the direct billing arrangement with anyone from OMC.[31]

OMC initially billed CMWS for the services of the Nicole Eymard at the Chandeleur 37 block.[32] OMC eventually billed PEO for this work instead,[33] but only after Michele Hammons of CMWS directed Kim Pitre of OMC to do so on September 25, 2008.[34]

From July 15 to July 27, 2008, the L/B Nicole Eymard was on location in the Chandeleur 37 block performing decommissioning activities.[35] CMWS's field supervisor, Randy LaFleur, was the only individual on board the L/B Nicole Eymard (besides the vessel's crew) from the date of the charter, July 15, 2008, until July 17, 2008.[36] On July 17, LaFleur was joined by four other

---

[30]    *Id.*

[31]    *Id.*

[32]    *See* OMC Exhibit 4 (invoice dated July 31, 2008 to Chet Morrison the "NICOLE EYMARD WORKING AS DIRECTED" from July 15, 2008 through July 31, 2008).

[33]    OMC Exhibit 5.

[34]    OMC Exhibit 6.

[35]    Uncontested Material Fact #5.

[36]    OMC Exhibit 3.

7

representatives of CMWS.[37] The Daily Master's Logs reflect that LaFleur served as the "Company Representative" for CMWS while on board the vessel.[38]

OMC contends that CMWS chartered the vessel from OMC for the Chandeleur 37 job and hence that CMWS owes it charter fees for that job. CMWS argues that was acting on behalf of PEO and/or HCR when it hired the barge, and thus that one of those entities is responsible for any outstanding charter fees.

## B. Applicable Law

Admiralty law principles govern the maritime contract disputes in this case. *Int'l Mar., LLC v. Delta Towing, LLC*, 704 F.3d 350, 354 (5th Cir. 2013). State contract law principles may also be applicable, to the extent they are not inconsistent with admiralty law. *Ham Mar., Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir. 1995).

A charter is formed when the parties have a meeting of the minds on the essential terms of the charter. *E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia*, 673 F. Supp. 796, 799 (E.D. La. 1987). Maritime law generally regards oral charters as valid and enforceable. *See, e.g.*, *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961). An oral charter "may be implied from

---

[37]     *Id.*

[38]     OMC Exhibits 2-3.

circumstances concerning the actual possession and use of a vessel." *St. Paul Fire & Mar. Ins. Co. v. Vest Transp. Co., Inc.*, 666 F.2d 932, 939 (5th Cir. 1982). The party seeking to enforce another party's performance under a contract must prove the existence of the contract by a preponderance of the evidence. *Kessler v. Popich*, 240 F. App'x 618, 621 (5th Cir. 2007). Moreover, in Louisiana, an oral contract with a value of more than $500 must be proven by at least one witness and other corroborating evidence. La Civ. Code art. 1846. "The plaintiff himself may serve as the witness to establish the existence of the oral contract. . . . But, the other corroboration must come from a source other than the plaintiff." *Suire v. Lafayette City-Parish Consol. Gov't*, 907 So.2d 37, 58 (La. 2005) (internal citations omitted). The corroborating evidence "need only be general in nature." *Id.* Whether a contract exists between two parties is a question to be determined by the trier of fact. *Price Farms, Inc. v. McCurdy*, 42 So.3d 1099, 1104 (La. Ct. App. 2010). Thus, the Court must consider the testimony and documentary evidence and determine whether OMC formed an oral charter for the L/B Nicole Eymard with CMWS, HCR, or PEO.

## C. Analysis

The documentary evidence, as well as testimony of representatives of OMC, PEO, and HCR, support a finding that CMWS

was the charterer of the vessel.[39] Although Williams stated at trial that was acting on behalf of PEO when he negotiated the charter hire with Avis Bourg III, he explicitly stated in his deposition that he had hired OMC on behalf of CMWS, *not* on behalf of PEO.[40] Avis Bourg III's testimony is consistent with the account Williams gave in his deposition.[41] Moreover, OMC prepared a job report to memorialize the agreement between Bourg III and Williams that lists the customer as "Chet Morrison/Well Division/Palm" and the Customer Rep as "John Dale Williams."[42] Bourg III testified that his usual practice in filling out job reports is to put the name of the contractor (that is, the charterer), followed by a backslash, and then the name of the operator (that is, the well owner).[43] This was done as a convenience to the contractor, which might have several jobs in progress simultaneously with the same liftboat company and would need a way to keep them straight.[44] Thus, the job report suggests

---

[39]   Testimony of Jonathan Garrett; John Dale Williams; Avis Bourg III.

[40]   Testimony of John Dale Williams.

[41]   Testimony of Avis Bourg III.

[42]   OMC Exhibit 1.

[43]   Testimony of Avis Bourg III. OMC mistakenly thought that PEO owned the Chandeleur 37 wells, which were in fact owned by HCR. *See* R. Doc. 1 at 3. OMC did not name HCR as a party to this suit.

[44]   Testimony of Avis Bourg III.

that OMC was working for CMWS, which was in turn working for HCR, the owner of the well.

While there were discussions between Williams and Garrett concerning a direct billing arrangement, Garrett stated that the arrangement did not alter the contractual relationships among the parties.[45] Even more importantly, the evidence suggests that any discussions about direct billing never reached OMC until after the charter had been executed. Bourg III had no contact with PEO or HCR about hiring a liftboat for the Chandeleur 37 job.[46] Furthermore, Williams forwarded the job report to Garrett with the subject line "OMC Job Report – Chet Morrison" and indicated, "I *will* have them bill you direct to avoid any markup,"[47] and Garrett stated that he had intended to have HCR pay CMWS for the charter hire until he received this offer from Williams. The timing of this e-mail exchange, combined with Williams' use of the future tense ("I *will* have them bill you direct), suggest that Williams had *not* discussed direct billing with OMC when he originally arranged for the charter hire. Indeed, HCR is mentioned nowhere in OMC's documents concerning the charter of the vessel for the Chandeleur 37 job.[48] And OMC in fact initially

---

[45]    Testimony of Jonathan Garrett.

[46]    Testimony of Jonathan Garrett.

[47]    PEO Exhibit 3 (emphasis added).

[48]    Testimony of Jonathan Garrett.

billed *CMWS* for the job.[49] OMC redirected the invoice for the
work on the Chandeleur 37 block in September, at CMWS's request,
in what OMC characterized as an accommodation for its customer.[50]

CMWS relies on the direct billing agreement reached between
Garrett and Williams to argue that it was not the charterer of
the vessel, but to no avail. Under Louisiana law, even if HCR
agreed to assume CMWS's obligation to pay the charter fees, that
agreement does not release CMWS from its obligation to OMC. *See*
La. Civ. Code art. 1821 ("An obligor and a third person may agree
to an assumption by the latter of an obligation of the former. .
. . The obligee's consent to the agreement does not effect a
release of the third person.").

Accordingly, OMC is entitled to recover charter fees from
CMWS for the period between July 15 and July 27, 2008, when the
L/B Nicole Eymard was on location at the Chandeleur 37 block.

CMWS has argued that, if it is found to have chartered the
L/B Nicole Eymard, it is entitled to pass on the charter fees to
the well owner, along with a 15% markup. Based on the testimony
of Williams and Garrett regarding direct billing, as well as
their July 15 e-mail exchange, the Court finds that HCR agreed to
assume ultimate liability for the charter fees. Williams proposed
a direct billing arrangement whereby HCR would pay OMC directly,

---

[49]    OMC Exhibit 4.

[50]    Testimony of Raimy Eymard.

and Garrett responded by sending Williams HCR's address. This is fairly construed as an agreement by Williams that HCR would pay OMC for the charter fees. Accordingly, CMWS is entitled to recover the fees for the Chandeleur 37 job from HCR.

CMWS may not, however, add a markup. While there is testimony stating that the custom in the industry is for the contractor to pass along costs for materials to the well owner, along with a markup,[51] the record is devoid of evidence that HCR and CMWS reached any such arrangement. Indeed, as noted above, the evidence suggests that Williams told Garrett that he would have OMC bill HCR directly in order to *avoid* the markup.[52]

In sum, the Court holds that CMWS is liable to OMC for the charter fees incurred between July 15 and July 27, and HCR is in turn liable to CMWS for the full amount of those fees.

## IV. THE WEST DELTA 55 JOB

## A. Chronology of Events

On July 27, 2008, Garrett contacted John Dale Williams of CMWS to request that the L/B Nicole Eymard proceed to the West Delta 55 block, owned by defendant PEO,[53] to pump cement into a

---

[51]    Testimony of Jonathan Garrett.

[52]    Testimony of Jonathan Garrett; John Dale Williams.

[53]    Uncontested Material Fact #3.

13

well that had experienced a well control event.[54] Williams admitted that he gave the new location to his crew on the barge and that the ship then set out for West Delta 55 to perform the work.[55] Williams also testified that he passed along the information about the new job to Bourg III, who agreed to keep the vessel out working in the Gulf.[56] Williams maintained that the West Delta 55 project was supposed to be another direct billing arrangement,[57] but Garrett testified that direct billing was never discussed.[58] Bourg III did not remember the specifics of his conversations with Williams.[59]

The parties dispute who chartered the Nicole Eymard for the West Delta 55 job. CMWS maintains that Williams was acting on behalf of Palm when he arranged for the vessel to proceed to the West Delta block, while PEO and OMC contend that CMWS remained the charterer throughout the barge's voyage.

## B. Analysis

The Court finds, based on the testimony and documentary

---

[54]   Testimony of Jonathan Garrett; John Dale Williams.

[55]   Testimony of John Dale Williams.

[56]   *Id.*

[57]   *Id.*

[58]   Testimony of Jonathan Garrett.

[59]   Testimony of Avis Bourg III.

14

evidence, that CMWS chartered the Nicole Eymard for the West Delta 55 job. Garrett testified that he understood CMWS to be PEO's contractor and OMC in turn to be CMWS's subcontractor.[60] He noted that he made all arrangements for the West Delta 55 job through Williams and never spoke with anyone from OMC.[61] Garrett's testimony is corroborated by an e-mail in which Garrett refers to OMC as CMWS's "sub" and a reply from Williams that does not dispute that characterization.[62] Further supporting this view is that at all relevant times PEO had no representatives aboard the L/B Nicole Eymard,[63] while CMWS, in contrast, had several representatives on the vessel.[64]

Avis Bourg III's testimony also supports a finding that CMWS chartered the vessel. He stated that the reason there was no duration or offload dock specified in the July 15, 2008 job report was that sometimes OMC's vessels went on to other locations after the initial job for which they were dispatched.[65] Indeed, he testified that his intention was to keep the Nicole Eymard working in the Gulf as long as possible before

---

[60]    Testimony of Jonathan Garrett.

[61]    *Id.*

[62]    OMC Exhibit 15.

[63]    Testimony of Jonathan Garrett.

[64]    OMC Exhibit 3.

[65]    Testimony of Avis Bourg III.

15

demobilizing.[66] He further stated that the chartering party remained the same throughout the duration of any one voyage.[67] If OMC were going to work for a different contractor, the vessel would return to port, offload the equipment on deck, take on fuel and water, renegotiate the terms of the new job, and fill out another job report memorializing those terms.[68] Here, that was not done, strongly suggesting that the vessel remained on charter with CMWS, under the terms set forth in the July 15 job report, throughout the West Delta 55 job.[69] And, as with the Chandeleur 37 job, OMC submitted its first bill for the West Delta 55 job to CMWS,[70] and only billed PEO after CMWS told it to do so in September.[71]

It is simply implausible that PEO, despite having no direct contact with OMC and no representatives on board the L/B Nicole

---

[66]    *Id.*

[67]    *Id.*

[68]    *Id.*

[69]    *Id.*

[70]    Testimony of Michele Hammons; Kim Pitre; OMC Exhibit 4.

[71]    Testimony of Michele Hammons; Kim Pitre; *see also* OMC Exhibit 6. The Court finds evidence that is nearly contemporaneous with the charter of the boat -- such as OMC's initial billing of CMWS for the West Delta 55 job -- to be much more probative on the issue of who chartered the vessel than the myriad after-the-fact machinations that the parties engaged in after they knew that the vessel repairs and downtime charter would present a major expense.

Eymard, suddenly contracted with OMC to charter the vessel while it was in the middle of the Gulf of Mexico. It is far more plausible that CMWS already had the vessel under charter, and simply extended that charter in order to complete the West Delta 55 job. Indeed, as noted above, Bourg III testified that this possibility was explicitly contemplated when he left blank the "demobilization" and "offload dock" portions of the job report.[72]

CMWS's contends that Williams was acting as a "representative" of PEO when he arranged for the West Delta 55 charter, but the Court finds this argument baseless. There is no evidence that Williams was subject to PEO's control, and furthermore, a Master Service Agreement between PEO and CMWS explicitly provides that CMWS shall not "be deemed for any purposes to be the employee, agent, servant, or representative of P[EO]."[73] Williams was acting on behalf of his own company, CMWS, when he negotiated the terms of the charter with Bourg III and chartered the vessel.

## C. CMWS's Remaining Arguments

CMWS makes three other specific arguments in support of its contention that PEO chartered the vessel. The Court finds each argument without merit.

---

[72]    Testimony of Avis Bourg III; OMC Exhibit 1.

[73]    PEO Exhibit 11.

First, CMWS notes that it did not obtain PEO's written authorization to use a subcontractor on the West Delta 55 job, as it was technically required to under the MSA between PEO and CMWS. That MSA provides that "Contractor [CMWS] may not assign this Agreement in whole or in part, or subcontract any portion of the work, without the prior written consent of P[EO]."[74] But that provision is for the benefit of PEO and so can be waived by PEO if it so chooses.[75] *See Lillis v. Owens*, 21 So.2d 185, 188 (La. Ct. App. 1945). Accordingly, CMWS cannot rely on PEO's failure to give consent to argue that PEO bears responsibility for the charter fees.

Second, CMWS claims that the charterer of the vessel has been conclusively established by judicial admission, because OMC contended in the bankruptcy proceedings of Palm Energy Partners that the debt for the charter of the L/B Nicole Eymard was owed by PEO under its MSA with OMC.[76] This is incorrect. "[J]udicial admissions are not conclusive and binding in a separate case from the one in which the admissions are made." *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001) (quoting *Universal Am. Barge Corp. v. J-Chem.*, 946 F.2d 1131, 1142 (5th Cir. 1991)). The Court may consider OMC's proof of claim in the

---

[74]     PEO Exhibit 11.

[75]     *See id.*

[76]     *See* OMC Exhibit 10.

bankruptcy proceedings as evidence, but OMC is entitled to controvert or explain it. *See id.;* 30B Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 7026 (2d ed. 2013). As explained above, the other evidence in this case compels a finding that CMWS, not PEO, chartered the vessel.

Finally, CMWS argues that OMC's actions in the bankruptcy proceedings judicially estop it from claiming that CMWS is responsible for the charter fees. This argument is also meritless. Where (1) a party was unsuccessful in convincing the first court of the proposition in question, (2) the earlier position was based on a mistake, and (3) the allegedly inconsistent position will not allow the party asserting it to gain an unfair advantage, application of the doctrine of judicial estoppel is generally not warranted. *See In re Ark-La-Tex Timber Co.*, 482 F.3d 319, 332-33 (5th Cir. 2007). Here, OMC did not succeed in obtaining charter fees from Palm Energy Partners, and in fact withdrew the claim when it determined that it was based on a mistake -- Palm Energy Partners did not owe any debt to OMC. Moreover, failure to apply the doctrine would not be unfair to CMWS, for two reasons. First, CMWS likely prompted OMC to submit a claim in the bankruptcy by telling OMC to bill PEO directly for the liftboat after OMC originally sent invoices to CMWS.[77] Second, as is discussed elsewhere in this opinion, CMWS will not

---

[77]    *See* Testimony of Michele Hammons.

19

bear ultimate responsibility for the charter fees, and so failure to apply the doctrine here will not work to its detriment.

**D. Summary**

Based on the foregoing analysis of the evidence, the Court concludes that OMC is entitled to recover charter fees from CMWS for the period between July 28 and August 18, 2008, when the L/B Nicole Eymard was on location at the West Delta 55 block.[78] It is true that the vessel performed well control work for only a few days within this period. But the Court finds credible the trial testimony suggesting that usual practice in the industry is for charter fees to be incurred as long as the vessel is on site.[79]

CMWS has claimed that, if it is found to be the charterer of the vessel for the West Delta 55 job, it is entitled to pass that expense through to PEO, along with a 15% markup. As was true with the Chandeleur 37 job, the Court finds that the well owner (here, PEO) agreed to assume ultimate liability for the charter fees. Williams testified that PEO had agreed to pay OMC directly for

---

[78] CMWS has argued that it would not have formed an oral charter with OMC because it had a Blanket Time Charter with OMC during this period and would have adhered to its provisions rather than forming a separate oral contract with plaintiff. However, this argument fails, because OMC signed the Blanket Time Charter with Chet Morrison Contractors, Inc. (CMC), which was a separate entity from CMWS at the time of the events giving rise to this suit. *See* R. Doc. 52-19.

[79] *See, e.g.*, Testimony of Jonathan Garrett; Avis Bourg III; Raimy Eymard; Michael Eymard.

the liftboat for the West Delta 55 job.[80] Garrett disputed
Williams' statement that PEO had agreed to pay OMC *directly*,[81]
but he agreed that the job was for PEO and consequently that PEO
would *ultimately* pay for the liftboat.[82] There is virtually no
evidence, however, that any representative of PEO agreed to pay
CMWS a 15% markup on the liftboat.

PEO nevertheless argues that CMWS compromised any claim for
charter fees pursuant to a January 26, 2011 agreement between
CMWS and PEO.[83] But William Gray's trial testimony makes clear
that the compromise in question concerned invoices for a job at
the West Delta 52 block -- a job completely unrelated to this
lawsuit.[84] Consequently, PEO's argument that it has already paid
CMWS for the charter hire for the West Delta 55 job must fail.
CMWS's CFO, Leroy Guidry, confirmed at trial that PEO has not
paid CMWS for liftboat services related to the West Delta 55
job.[85]

In sum, the Court concludes that CMWS chartered the Nicole
Eymard for the West Delta 55 job. CMWS must pay OMC charter fees

---

[80]    Testimony of John Dale Williams.

[81]    Testimony of Jonathan Garrett.

[82]    *Id.*; OMC Exhibit 15.

[83]    *See* PEO Exhibit 6.

[84]    *See* Testimony of William Gray.

[85]    Testimony of Leroy Guidry.

for the period between July 28 and August 18, 2008. PEO, in turn, must reimburse CMWS for the full amount of those charter fees.

## V. THE DAMAGES AND SUBSEQUENT REPAIRS TO THE VESSEL

### A. Chronology of Events

On July 29, 2008, the L/B Nicole Eymard jacked down and attempted to break bottom, and one leg of the vessel became stuck.[86] For over two weeks, the OMC crew, as well as divers from Offshore Construction and Diving, Inc., unsuccessfully attempted to free the vessel.[87] By August 15, OMC had become concerned about the safety of its vessel and crew because of the impending Tropical Storm Fay, which was projected to (and eventually did) enter the Gulf of Mexico where the L/B Nicole Eymard was lodged.[88]

OMC maintains that it then reached an agreement with CMWS and PEO whereby OMC would cut the leg of the vessel in order to free it, and defendants would compensate OMC for the cost of repairs and charter fees for the time during which the barge was being repaired.[89] CMWS denies that any of its representatives

---

[86]    OMC Exhibit 2; Testimony of Kurt Luwisch.

[87]    OMC Exhibit 2; Testimony of Michael Eymard; Kurt Luwisch.

[88]    Testimony of Jonathan Garrett; Michael Eymard.

[89]    See Testimony of Michael Eymard.

made any such assurances on behalf of CMWS.[90] PEO maintains that
it merely told OMC that PEO would submit a claim to its insurer
for the repair costs and the downtime charter, but did not agree
to reimburse OMC for those costs in the event that the insurance
did not cover them.[91]

OMC cut the leg of the L/B Nicole Eymard and left the West
Delta 55 well during the days of August 17 and 18, 2008.[92] OMC
initially paid the costs of repairing the vessel, then submitted
a series of invoices for those costs to CMWS.[93] Michele Hammons,
the accounts payable clerk for CMWS, testified that the invoices
did not have a purchase order, which indicated that they should
not be paid.[94] On September 25, 2008, CMWS instructed OMC to bill
PEO directly for the charter fees and costs associated with the
repairs and charter fees.[95] OMC obliged, cancelling the invoices
issued to CMWS and re-billing PEO for the costs associated with
the repairs of the vessel.[96] These invoices totaled $2,163,844.99

---

[90]    *See, e.g.*, Testimony of John Dale Williams.

[91]    Testimony of Jonathan Garrett; John Dale Williams.

[92]    OMC Exhibit 2.

[93]    OMC Exhibit 4; Testimony of Raimy Eymard; Kim Pitre;
Michele Hammons.

[94]    Testimony of Michele Hammons.

[95]    OMC Exhibit 6; Testimony of Kim Pitre; Michele Hammons.

[96]    OMC Exhibits 5, 7; Testimony of Raimy Eymard; Kim
Pitre.

-- $681,875 for the charter fees between July 15, 2008 and August 18, 2008; $1,007,000.00 for the charter fees between August 19, 2008 and October 10, 2008 (the downtime charter); and $442,991.99 for the costs of repair.[97] PEO did in fact submit a claim to its insurer for OMC's losses, as it had promised, but its insurers denied the claim.[98] OMC was never paid for anything.[99]

**B. Analysis**

Once again, the Court must weigh the evidence to determine whether a contract was made whereby one or both of the defendants agreed to pay for the repair costs and downtime charter.

OMC representative Michael Eymard testified at trial that the parties formed an agreement that CMWS and/or PEO would pay for the repair costs and downtime charter if OMC cut the leg of vessel.[100] As corroboration, OMC points to the invoices for charter hire (which included the downtime charter) that it sent to CMWS,[101] and CMWS's lack of challenge to the content of the invoices.[102]

---

[97]     OMC Exhibit 5.

[98]     PEO Exhibit 7.

[99]     Testimony of Raimy Eymard; Kim Pitre.

[100]    Testimony of Michael Eymard.

[101]    OMC Exhibit 4.

[102]    Testimony of Michele Hammons.

24

Nevertheless, the Court concludes that OMC has failed to prove the alleged agreement by a preponderance of the evidence. While, as noted above, Michael Eymard testified that John Dale Williams told him that CMWS and/or PEO would reimburse OMC for the repair costs and downtime charter, Avis Bourg, Jr., part-owner of OMC in 2008, testified that he was not aware of any such arrangement.[103] It would be somewhat odd if OMC entered into a contract with such large financial ramifications without the knowledge or consent of a part-owner. Williams, for his part, has flatly denied offering to pay for the repair and downtime charter.[104] OMC's corroborating evidence -- CMWS's lack of objection to the invoices for downtime charter hire -- is quite weak; CMWS had no incentive to contest the invoices, since it simply passed them along to PEO. As for PEO, Garrett has steadfastly maintained that PEO merely offered to submit a claim to its insurer (not to reimburse OMC for the loss out of its own pocket).[105] Garrett's offer was not an admission of liability; he simply stated that all the parties involved agreed that they would contact their insurers to see if they might pay for the

---

[103]    Testimony of Avis Bourg, Jr.; *see also* Testimony of Avis Bourg III.

[104]    Testimony of John Dale Williams.

[105]    Testimony of Jonathan Garrett.

repairs.[106] OMC has presented no convincing evidence to contradict Garrett's account. Indeed, Michael Eymard testified that he never even spoke with Garrett about the leg being stuck.[107]

Accordingly, the evidence does not support a finding that OMC entered into an oral agreement with either CMWS or PEO for repair costs and downtime charter for the L/B Nicole Eymard.

## VI. CLAIMS FOR INDEMNITY AND ATTORNEYS' FEES

The parties also assert various claims against each other for indemnity and attorneys' fees based on the Master Service Agreements between them.

## A. Legal Standard

"A maritime contract containing an indemnity agreement, whether governed by federal maritime law or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009). An indemnity provision is interpreted to cover the losses or liability reasonably contemplated by the parties, *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981), but it "will not afford protection unless its terms are expressed unequivocally," *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 834 (5th Cir. 1992). The Court will describe the

---

[106]   *Id.*

[107]   Testimony of Michael Eymard.

relevant provisions of each of the MSAs in question and explain the legal effect of those provisions on the indemnity obligations of the parties.

## B. The MSA Between PEO and CMWS (PEO Exhibit 11)

In this MSA, CMWS is referred to as "Contractor" and PEO is referred to as "Palm."[108] The "Palm Group" is defined as "Palm, its employees, subsidiaries, affiliated companies, joint venturers, partners, contractors and subcontractors (excluding "Contractor Group" . . .), agents, invitees, and all of their respective vessels, officers, directors, and employees."[109] The "Contractor Group" is defined as "Contractor, its employees, subsidiaries, affiliated companies, joint venturers, partners, contractors, subcontractors, agents, invitees, and all of their respective vessels, officers, directors, and employees."[110] These provisions, read in combination, indicate that OMC is in the "Contractor Group," because it is a contractor of CMWS.

CMWS asserts a claim for indemnity against PEO under the MSA based on the latter's failure to provide a map of the West Delta 55 block showing potentially hazardous obstructions. CMWS argues that the vessel would not have attempted to jack down, and thus

---

[108]   *See* PEO Exhibit 11 at 1.

[109]   *Id.* Ex. A § II.C.

[110]   *Id.* Ex. A § II.D.

would not have become stuck, had CMWS's representatives had a map showing obstructions on the ocean floor. The section of the MSA in question provides:

> Before starting work, Contractor shall make a thorough inspection of the work site to determine the difficulties and hazards incident to doing the work, and Palm shall disclose any circumstance or condition which would be dangerous or hazardous to Contractor or its employees and subcontractors. Palm shall furnish a map setting forth the correct locations of all pipelines, platforms, other facilities, and obstructions in the area of the work, and shall release, defend, indemnify, and hold harmless Contractor Group (as defined in Exhibit "A") from third party claims, demands, or suits to the extent arising out of errors or omissions contained in said map.[111]

Yet Jonathan Garrett testified that PEO did provide Chet Morrison with a "base map," a document showing the location of the well and the flow lines.[112] Garrett also stated that he was not aware of the existence of any obstructions under the mudline at the West Delta 55 block.[113] The only evidence suggesting that obstructions were present is the testimony of Kurt Luwisch, who said that when the crew tried to pull the leg of the vessel free, it began moving forward. Luwisch admitted that the vessel likely would not slide if it were stuck in the mud.[114] This testimony tends to suggest that the leg could have been caught on an

---

[111]   *Id.* § 5.1.

[112]   Testimony of Jonathan Garrett.

[113]   *Id.*

[114]   Testimony of Kurt Luwisch.

obstruction, but it is not sufficient to permit a conclusion that an obstruction was even present, much less that PEO's failure to provide a map depicting the obstruction caused the vessel to become stuck and thus rendered PEO liable for indemnity.

CMWS and PEO also assert claims for indemnity against each other based upon the knock-for-knock indemnity agreement in Exhibit A of the MSA. The relevant provisions are as follows:

> Contractor shall release, defend, protect, indemnify, and hold harmless [the "Palm Group"] from and against all suits, actions, claims, liabilities, damages, and demands based on personal injury or death or property damage or loss . . ., whenever occurring, suffered by any of the Contractor Group . . . or by Contractor's subcontractors or their employees, where the claim or loss arises out of, is connected with, incident to, or is directly or indirectly resulting from or relating to the performance of this Agreement or out of any related or unrelated activities in the vicinity thereof, whether the claim is groundless or not, and whether the loss, damage, death or injury is caused in whole or in part by the negligence or fault of any of the Palm Group . . . .[115]

> Palm shall release, defend, protect, indemnify, and hold harmless [the "Contractor Group"] from and against all suits, actions, claims, liabilities, damages, and demands based upon personal injury or death or property damage or loss, whenever occurring, suffered by any of the Palm Group where the claim or loss arises out of, is connected with, incident to, or is directly or indirectly resulting from or relating to the performance of this Agreement, whether the claim is groundless or not, and whether the loss, damage, death or injury is caused in whole or in part by the negligence or fault of any of the Contractor Group . . . .[116]

Because OMC is part of the "Contractor Group," OMC's claims

---

[115]    PEO Exhibit 11 Ex. A, § II.C.

[116]    *Id.* Ex. A, § II.D.

for charter fees for the West Delta 55 job and for repair costs
and downtime charter are "based on . . . property damage or loss
. . . suffered by any of the Contractor Group" that "relat[ed] to
the performance of th[e] Agreement." *Cf. Energy XXI, GoM, LLC v.
New Tech Eng'g, LP*, 787 F. Supp. 2d 590, 605-07 (S.D. Tex. 2011)
(finding that a similarly worded indemnity clause was broad
enough to encompass losses resulting from an alleged breach of
contract). (OMC's claims concerning the Chandeleur 37 job are not
covered by the PEO-CMWS MSA, since that job was done for HCR.)
Accordingly, Contractor (CMWS) must indemnify PEO against OMC's
suit insofar as it concerns the West Delta 55 job and the claims
for repair costs and downtime charter. But, since the Court held
that PEO was not liable to OMC for any damages, there is no
liability that PEO could be indemnified against. Yet CMWS does
have an obligation to pay PEO's attorneys' fees under the
following clause:

> The indemnitor shall promptly pay (i) to any indemnitee
> all costs and reasonable attorneys' fees incurred by such
> indemnitee resulting directly or indirectly from any and
> all loss, damage, injury, liability, and claims for which
> the indemnitor is obligated to indemnify such indemnitee
> pursuant to this Section II, and (ii) to any indemnitee
> all costs and reasonable attorneys' fees in any legal
> action in which such indemnitee prevails, either in whole
> or in part, brought against indemnitor based upon a
> breach of any of the provisions of this Exhibit A.[117]

Under Ex. A § II.E(i), CMWS must pay PEO the costs and

---

[117]    *Id.* Ex. A, § II.E.

30

attorneys' fees PEO incurred defending against OMC's claims for the West Delta 55 charter fees and for repair costs and downtime charter. CMWS is also obligated to pay the costs and attorneys' fees PEO incurred in its *crossclaim against CMWS for indemnity* under clause (ii), because PEO "prevail[ed], either in whole or in part," in that crossclaim.

### C. The MSA Between OMC and PEO (PEO Exhibit 9)

The indemnity provisions in this MSA do not apply to any of OMC's claims. Because Chet Morrison, rather than PEO, contracted with OMC for the charter of the vessel for the West Delta 55 job, there was no agreement concerning the vessel executed under the OMC-PEO MSA. Accordingly, no party owes any other party indemnity under the OMC-PEO MSA. And, because no indemnity is owed under the OMC-PEO MSA, no attorneys' fees are owed under the agreement either.[118]

### D. The MSA Between CMWS and HCR (CMWS Exhibit 6)

In this MSA, CMWS is referred to as "Contractor" and HCR is referred to as "HC."[119] The "HC Group" is defined as "HC, its employees, subsidiaries, affiliated companies, joint venturers, partners, contractors and subcontractors (excluding "Contractor Group" . . .), agents, invitees, and all of their respective

---

[118]   *See* PEO Exhibit 9 Ex. A, § II.E.

[119]   CMWS Exhibit 6 at 1.

31

vessels, officers, directors, and employees."[120] The "Contractor Group" is defined as "Contractor, its employees, subsidiaries, affiliated companies, joint venturers, partners, contractors, subcontractors, agents, invitees, and all of their respective vessels, officers, directors, and employees."[121] The two foregoing provisions together indicate that OMC is included in the "Contractor Group," because it is a contractor of CMWS.

This MSA also contains a knock-for-knock indemnity provision:

> Contractor shall release, defend, protect, indemnify, and hold harmless [the "HC Group"] from and against all suits, actions, claims, liabilities, damages, and demands based on personal injury or death or property damage or loss . . ., whenever occurring, suffered by any of the Contractor Group or by Contractor's subcontractors or their employees, where the claim or loss arises out of, is connected with, incident to, or is directly or indirectly resulting from or relating to the performance of this Agreement or out of any related or unrelated activities in the vicinity thereof, whether the claim is groundless or not, and whether the loss, damage, death or injury is caused in whole or in part by the negligence or fault of any of the HC Group . . . .[122]

> HC shall release, defend, protect, indemnify, and hold harmless [the "Contractor Group"] from and against all suits, actions, claims, liabilities, damages, and demands based upon personal injury or death or property damage or loss, whenever occurring, suffered by any of the HC Group where the claim or loss arises out of, is connected with, incident to, or is directly or indirectly resulting from or relating to the performance of this Agreement, whether

---

[120]   *Id.* Ex. A, § II.C.

[121]   *Id.* Ex. A, § II.D.

[122]   *Id.* Ex. A, § II.C.

the claim is groundless or not, and whether the loss, damage, death or injury is caused in whole or in part by the negligence or fault of any of the Contractor Group . . . .[123]

CMWS and HCR agree that this MSA is applicable to the Chandeleur 37 job, which involved HC's contracting with CMWS to perform a P&A operation at those wells.[124] But OMC did not sue HCR, and thus there is no liability on the part of HCR that HCR could be indemnified against under this agreement. And, because there is no indemnity obligation on the part of either party, there is likewise obligation to pay attorneys' fees.[125]

## VII. CONCLUSION

The Court has endeavored to interpret the parties' agreements in a manner consistent with the arrangements they reached throughout the interactions that gave rise to this lawsuit, taking full account of all of the evidence adduced by the parties and the testimony given at trial. The Court believes that evidence contemporaneous to the various alleged agreements is significantly more probative than evidence of the parties' after-the-fact machinations, and accordingly it has placed significantly more weight on the former than the latter.

---

[123]   *Id.* Ex. A, § II.D.

[124]   *See* CMWS Exhibit 30 (invoice from CMWS to HCR for P&A work performed at the Chandeleur 37 wells).

[125]   *See* CMWS Exhibit 6 Ex. A, § II.E.

33

In summary, the Court holds the following:

(1)  CMWS is liable to OMC for the charter of the L/B
     Nicole Eymard for the Chandeleur 37 job, which
     took place from July 15 to July 27, 2008. HCR is
     in turn liable to CMWS for the full amount of
     those charter fees.

(2)  CMWS is liable to OMC for the charter of the
     vessel for the West Delta 55 job, which took place
     from July 28 to August 18, 2008. PEO is in turn
     liable to CMWS for the full amount of those
     charter fees.

(3)  Neither CMWS nor PEO is liable for the repair
     costs and downtime charter associated with the
     decision to cut the leg of the vessel.

(4)  Chet Morrison is obligated under its MSA with PEO
     to pay PEO (a) the costs and attorneys' fees PEO
     incurred defending against OMC's claims insofar as
     they concern the West Delta 55 job and the repair
     costs and downtime charter; and (b) the costs and
     attorneys' fees PEO incurred in bringing the
     crossclaim against Chet Morrison for indemnity.

For the foregoing reasons, it is the judgment of this Court
that CMWS owes **$249,750.00** to OMC in outstanding charter fees
for the L/B Nicole Eymard for the period between July 15 and
July 27, 2008. Because the invoices submitted to CMWS provide
that 1.5% interest is added after 30 days,[126] CMWS must add one
and one half percent prejudgment interest to each invoice to run
from the date 30 days after the invoice was issued. HCR in turn
owes **$249,750.00**, also with prejudgment interest, to CMWS. *See*
*Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir.
1986) ("Under maritime law, the awarding of prejudgment interest

---

[126]  *See* OMC Exhibit 4.

34

is the rule rather than the exception, and, in practice, is well-nigh automatic.").

CMWS owes **$432,125.00** to OMC in outstanding charter fees for the L/B Nicole Eymard for the period between July 27 and August 18, 2012, with one and one half percent prejudgment interest on each invoice to run from the date 30 days after the invoice was issued. PEO in turn owes **$432,125.00**, also with prejudgment interest, to CMWS. *See id.*

CMWS owes PEO the reasonable attorneys' fees and costs that PEO incurred in defending against OMC's claims regarding the West Delta 55 job, repair costs, and downtime charter, as well as the fees it incurred in bringing the crossclaim against CMWS for indemnity. The Court refers the issue of the amount of attorneys' fees and costs that PEO can recover to Magistrate Judge Daniel Knowles for a report and recommendation.

New Orleans, Louisiana, this 7th day of October, 2013.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE